# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs July 26, 2006

## STATE OF TENNESSEE v. BENNY RAY MITCHELL

**Appeal from the Circuit Court for Cocke County**
**No. 9331   Ben W. Hooper II, Judge**

---

**No. E2005-01896-CCA-R3-CD - Filed September 14, 2006**

---

The Defendant, Benny Ray Mitchell, was convicted of theft of property valued over $10,000 and for operation of a chop shop. The trial court sentenced the Defendant, a persistent offender, to twelve years for the theft conviction and ten years for the operation of a chop shop, and it ordered that the sentences run consecutively. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the jury was unable to render an unbiased verdict because one juror had a medical condition that he willfully failed to disclose. Finding that there exists no reversible error, we affirm the judgments of the trial court

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and J.C. MCLIN, JJ., joined.

Brad L. Davidson, Newport, Tennessee, for the appellant, Benny Ray Mitchell.

Paul G. Summers, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Alfred C. Schmutzer, Jr., District Attorney General; James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Facts

This case arises from the Defendant's conviction for theft of property valued over $10,000 and for the operation of a chop shop. At the Defendant's trial, the following evidence was presented: Frank Jackson Patton, Jr. testified that he and his wife visited the Newport area on October 30th and 31st of 2004, and they stayed at a motel in Newport. At the time, Patton drove a 2003 diesel Chevrolet Silverado, model 2500HD, with four doors and four-wheel drive that he had bought for $46,683 six months prior to this incident. Patton said that the truck had approximately 5,600 miles on it, and it had a canopy on the back of the truck that contained tools and Christmas presents that he had recently purchased. He estimated that the value of the tools and the presents was $6,100, and the value of the truck was over $10,000. Patton described how

his truck came equipped with OnStar, which is a device that can track a stolen vehicle by satellite.

Patton testified that, when he awoke at the motel on the morning of November 1, 2004, his truck was gone. He said that he called the local police department, and officers came to take an incident report. Patton said that he did not see his truck again until he was contacted by Detective Carroll and told to come identify his truck, which he did. He said that he was able to identify his truck and some personal items that were in the truck. When Patton saw the truck, he noticed that the hood had been removed, the headlights had been partially removed, and the air cleaner had been loosened and lifted up. On cross-examination, Patton admitted that he did not see who had taken his truck, and he did not see the Defendant take his truck.

Roger Henderson testified that his niece is married to the Defendant and that he and the Defendant have never gotten along very well, so he avoids the Defendant. He said that he owns a heat and air and appliance service, and he is also a reserve deputy with Cocke County Sheriff's Department, which means that he is a volunteer who rides with other officers and helps them. Henderson recalled that he was riding with Officer Frank Petrey[1] on November 1, 2004, when they got a call on the police radio about someone trying to steal a truck in the Bridgeport area. The two proceeded to the address given by the dispatcher, and they went between the house and a little "makeshift" garage building. There, about 100 feet away from the garage Henderson saw the Defendant and another man named Kevin Ball walking through the grass toward the interstate. Officer Petrey activated the blue lights of the police cruiser, and Henderson called to the Defendant and Ball, who both walked back to the cruiser.

After the Defendant and Ball walked back to the cruiser, Officer Petrey and Henderson placed them in handcuffs, and Henderson stayed with the handcuffed men while the officer went to look in the garage. Henderson said that, when the officer returned, he told Henderson that there was a new truck in the garage that was being stripped. The officer then placed the men under arrest. Henderson then identified pictures of the truck that was in the garage being stripped. In the garage, he also saw "chain horses," which are designed to lift heavy weights such as engines. Henderson also saw a camper top in one corner of the garage and an OnStar device lying in the garage in a pile of leaves and papers that looked like they had been burned.

John Carroll, a detective with the Cocke County Sheriff's Department who specializes in auto theft investigation, testified that he was involved in the investigation of the theft of the Patton's truck. Detective Carroll testified that he received a call from his dispatch office saying that OnStar had contacted the office because OnStar had received a signal from the OnStar device in the Patton's truck. The detective was unable to immediately respond, but he contacted OnStar and told them to call him if the truck moved. Then, Detective Carroll called Officer Petrey and told him to go to the address given by OnStar and that he would find the truck there. Detective Carroll later went to that address, and he saw what appeared to be a chop shop. He

---

[1]The record reflects that Officer Frank Petrey had regrettably passed away prior to this trial rendering him unavailable to testify.

2

also saw the OnStar device and the circuit board, which is supposed to be hidden inside the truck, in a pile that appeared to have been burned.

At the chop shop, the detective saw numerous parts as well as vehicles that were identifiable as stolen, including a water meter truck, a race car, a Chevrolet truck, and a four-wheeler. Because of this, the detective filed a forfeiture proceeding that resulted in any parts and cars that were unclaimed being sold. He said that the Defendant never claimed any of these parts or vehicles. In addition to the stolen parts and stolen vehicles, the detective saw tools that were used in the furtherance of the chop shop. Detective Carroll testified that he seized the truck as part of the investigation, and he asked Patton to come and identify the truck. The detective learned that the residence where the truck was found was being rented to Curtis Reed.[2]

On cross-examination, the detective said that, at the time of this investigation, Curtis Gene Reed lived at the address where the chop shop was located, and Reed had pled guilty to operating the chop shop. He also testified that he did not check for any fingerprints on any of the cars. Detective Carroll said that there were various hand tools scattered in the structure, including ratchets and wrenches and "various things used to disassemble a vehicle." The detective said that he never personally saw the Defendant at the garage.

Curtis Gene Reed testified that he is currently incarcerated and serving a sentence for theft and operating a chop shop at a house that he was renting, charges to which he pled guilty. Reed testified that there were two men besides him involved in this operation, the Defendant and Kevin Ball. Reed testified that the Defendant had the 2003 Chevrolet truck involved in this case for four days, and Reed told him that he did not want the Defendant to bring the truck to his house because he knew that it was equipped with OnStar. Reed said that less than an hour after the Defendant brought the truck to his house the police arrived looking for the truck. Reed testified that the Defendant came to him and wanted him to take the truck apart, strip the parts, and sell the parts to make extra money. Reed said that he and the Defendant have taken parts of stolen cars before, and he saw the Defendant drive the 2003 Chevrolet truck to his garage. Reed estimated that if the truck had been stripped, the parts would have brought $3,000.

On cross-examination, Reed testified that he pled guilty to operating a chop shop and received seven years. Reed said that he saw the Defendant drive the truck to Reed's house on a Saturday, and Reed stayed at his house only a few minutes after the truck arrived.

Based upon this evidence the jury found the Defendant guilty of theft of property valued over $10,000 and of operation of a chop shop. It is from this judgment that the Defendant now appeals.

---

[2]We note that this portion of the record indicates that Curtis Reed's name is Curtis Cob Reed. Curtis Reed later testified that his name is Curtis Gene Reed, and we will therefore refer to him as Curtis Gene Reed.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the jury was unable to render an unbiased verdict because one juror had a medical condition that he willfully failed to disclose.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial is insufficient to sustain his convictions because, while he was admittedly present at the chop shop, the only testimony that he was involved in the operation was that of a convicted co-defendant. The State contends that there was sufficient evidence presented to corroborate the co-defendant's testimony.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). It also should not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden

4

of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In Tennessee, it is well established that a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004) (citing State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)).

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence be slight and entitled, when standing alone, to but little consideration.

Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. 1971); see Bough, 152 S.W.3d at 464; State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994).

In the case under submission, the Defendant was found guilty of theft of property valued over $10,000 and of operation of a chop shop. A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103 (2003). Tennessee Code Annotated section 55-5-203 (2003) states:

> (a) It is an offense to:
> (1) Knowingly own, operate or conduct a chop shop;
> (2) Transport any motor vehicle or motor vehicle component part to or from a location, knowing such location to be a chop shop;
> (3) Purchase or receive any motor vehicle or motor vehicle component part from a location knowing such location to be a chop shop; or
> (4) Sell or transfer any motor vehicle or motor vehicle component part to a location knowing such location to be a chop shop.

Tennessee Code Annotated section 55-5-202(1) (2003) defines "chop shop," stating:

> "Chop shop" means any building, lot, or other premises where one (1) or more persons knew, or should have known, that they were engaged in altering, destroying, disassembling, dismantling, reassembling, or storing any motor

vehicle or motor vehicle component part which was obtained by theft, or any other unlawful means to either:

> (A) Alter, counterfeit, deface, destroy, disguise, falsify, forge, obliterate or remove the identity, including the vehicle identification number of such motor vehicle or motor vehicle component part, or to prevent the identification of such motor vehicle or motor vehicle component part; or

> (B) Sell or dispose of such motor vehicle or motor vehicle component part; . . . .

The evidence in this case, viewed in the light most favorable to the State, proves that Patton's 2003 diesel Chevrolet Silverado valued well over $10,000 was stolen from a motel parking lot during the nighttime hours of October 31, 2003. The OnStar device in the truck was activated, and the police were called to an address given to them by OnStar. The Defendant and another man, Ball, were seen leaving a makeshift garage at the address. Inside the garage, the police found Patton's truck partially dissembled, in addition to other stolen parts and stolen vehicles. Reed testified that he saw the Defendant drive a 2003 Chevrolet Silverado into the garage and that the two had stripped cars and sold the parts for money on previous occasions. We conclude that Reed's testimony was sufficiently corroborated by the other direct and circumstantial evidence presented by the State and that the evidence is sufficient to support the Defendant's convictions. The Defendant is not entitled to relief on this issue.

### B. Unbiased Verdict

The Defendant next contends that the jury was unable to render an unbiased verdict because one juror, Noah Mease, had a medical condition that he willfully failed to disclose. The Defendant contends that this juror believed that the Defendant was innocent but voted guilty so that he could leave the jury and go to see his doctor. Therefore, he contends, the jury was unable to render an unbiased verdict. The State contends first that this issue is waived because the Defendant failed to file a timely amendment to his motion for new trial. Further, the State contends that the issue is waived because the transcript of the voir dire proceedings is not included in the record. Finally, the State asserts that, even if not waived, this issue is without merit.

The Defendant's conviction was entered on May 18, 2005. His original motion for new trial was timely and was entered on June 15, 2005, and no mention was made in that motion about an ill juror. A hearing on the motion for new trial was held on June 21, 2005. Subsequently, the Defendant filed an amended motion for new trial, on June 29, 2005, in which he alleged that one of the jurors was ill and thought that he was having a heart attack. Attached to that amended motion for new trial, was an affidavit from one juror, Noah Mease, stating that Mease thought that the Defendant was innocent and that the evidence was not sufficient to find him guilty. The affiant goes on to state that Mease had several medical conditions that "acted up to the point I was sure I was having a heart attack." He said that he wanted to say that his health

6

conditions prevented him from communicating his thoughts, and he decided to vote "guilty" with the rest of the jurors so that he could go see his doctor. Mease swore that he contacted the Defendant's attorney on June 24, 2005, to tell him about his medical conditions and the events that occurred during deliberations.

At a hearing on the amended motion for new trial, the trial court found:

[I]t's Rule 606 of the Rules of Evidence that preclude[s] this Court from considering the affidavit or even taking any testimony. Now, I would suppose that I could permit a proper offer of proof but the affidavit, I believe, would be sufficient if this needs to be looked at by the Appellate Court.

But the law absolutely prohibits the consideration of this affidavit. It just can't be done . . . . It's well established. It's a rule that has been set. There are exceptions. I think if there's been some outside pressure that's been put on this juror, which there has not been, if there's been some extraneous information brought to the jury or juror, that would be an exception to the general rule. And I think if there's evidence of a quotient verdict then that would really be a civil case, you could take proof there. Certainly you may raise this matter on appeal . . . .

. . . .

But now let me tell you, I polled this jury. If that's the verdict of each and everyone of you, raise your right hand. He was under oath, he raised his hand and this jury was dismissed.

We first address the State's contention that the Defendant has waived this issue. The Defendant's claim was not included in his written motion for new trial. See Tenn. R. Crim. P. 37(c); Tenn. R. App. P. 3(e) (in cases tried before a jury, no issue of trial court error in the exclusion of evidence shall be reviewable on appeal "unless the same was specifically stated in a motion for new trial"). The motion for new trial was amended via a motion filed on June 29, 2005, after the hearing date. Tennessee Rule of Criminal Procedure 33(b) states, "A motion for a new trial shall be made in writing, or . . . reduced to writing, within thirty days of the date the order of sentence is entered. The Court shall upon motion allow amendments liberally until the day of the hearing of the motion for a new trial." The Advisory Commission Comments to Rule 33 state:

Some attorneys seek to "reserve the right to amend" a motion for a new trial, and subsequently file such amendments without a court order permitting it. Clearly the philosophy of the rule is to permit timely amendments, and for that reason the rule does not close that time frame until the motion is heard. However, the fact that the trial judge "shall allow amendments liberally" does not mean that the judge shall allow all such amendments, and counsel must not make a regular practice of filing only a skeletal motion with the intention of bringing all of their

7

substantive grounds in an amendment carried to the hearing. The trial judge retains the power to deny amendments, and strong consideration should be given to whether the new ground being raised was promptly brought to the court's attention.

In the case under submission and as stated above, the Defendant filed his amended motion for new trial on June 29, 2005, and he was not sentenced until July 25, 2005. While the amendment was filed after the first hearing on the motion for new trial, it was prior to the date the order of sentence was entered. The trial court allowed the amendment and held a hearing on the amended motion for new trial. Under these circumstances, we conclude that the trial court had jurisdiction to hear the amendment, and the Defendant has not waived this issue on appeal.

The State next contends that the Defendant waived this issue by failing to include a transcript of the voir dire proceedings with the record. It is true that, when a party seeks appellate review of an issue, the party has a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issue presented for review. State v. Griffis, 964 S.W.2d 577, 592 (Tenn. Crim. App. 1997) (footnote omitted). When the record is incomplete and does not contain a transcript of the proceedings relevant to the issue presented for review, the appellate court is precluded from considering the issue. Id. at 592-93 (footnote omitted). Instead, the appellate court must conclusively presume the ruling of the trial court on the motion was correct. Id. at 593 (footnote omitted).

In the case presently before us, the Defendant asserts that juror Mease willfully failed to disclose his health condition from the trial court during voir dire, and, had "juror Mease . . . informed the court of these conditions he surely would have been excused from service." Without the transcript of voir dire, we cannot properly review this issue. Not withstanding that conclusion, we note that the trial court addressed this issue on its merits and found that it did not provide the Defendant grounds for relief. Having reviewed the trial court's reasoning, we conclude that it is sound and will briefly summarize the trial court's basis for its decision.

Tennessee Rule of Evidence 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b). The purpose and origins of the rule were discussed recently in Walsh v. State, 166 S.W.3d 641 (Tenn. 2005). The Supreme Court explained that Rule 606(b) is "'grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences.'" Id. at 646 (quoting Tanner v. United States, 483 U.S. 107, 121 (1987)). The court continued:

> The rule promotes full and frank discussion in the privacy of the jury room and protects jurors from harassment by the losing party who might seek to impeach the verdict. Thus, the overarching purpose of both the federal and Tennessee Rule 606(b) is to protect the integrity of the jury's deliberative process.
>
> To this end, a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations, or emotions. The rule does, however, make an exception in three circumstances, allowing juror testimony if there has been: (1) extraneous prejudicial information, (2) outside influence, or (3) an antecedent agreement to be bound by a quotient or majority result. Further, when it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless.

Id. at 646-47 (citations omitted).

In the case under submission, we have reviewed Juror Mease's affidavit, and we conclude, as did the trial court, that this affidavit does not allege any of the three circumstances that are exceptions to Rule 606(b). Therefore, the trial court properly denied the Defendant's amended motion for new trial based upon this affidavit. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

9